No. 41.—HOSEA C. GIDDENS, plaintiff in error, *vs.* HENRY MIRK, defendant.

[1.] To say of another "*I believe Giddens burnt the camp-ground,*" is actionable.

[2.] Where demurrer to the whole declaration is sustained, an amendment cannot be received, there being nothing to amend by.

Case for Words, in Jackson Superior Court.    Tried before Judge DOUGHERTY, February Term, 1848.

The original declaration charged that the defendant below, Henry Mirk, in a certain conversation, "concerning the burning of the houses and tents at the Dry Pond Camp Ground, in the presence, &c. published of the plaintiff these words, " I believe Giddens burnt the Camp Ground." The words were charged to have been spoken on the 8th November, 1845, and the declaration was filed in office on the 26th of February, 1846.

On the 29th of September, 1847, the plaintiff (the case being on the Appeal) filed by way of amendment two additional counts, setting out these words as spoken at the same time—"I believe Giddens burnt the Camp Ground. And if you knew what I know, your opinions might be altered. I have said that I believed that Giddens burnt the Camp Ground, and will continue to say so, and will say so in Court, if required; and I believed it within ten minutes after I saw the fire, and I can assign my reasons for believing so, but as long as I have not done so I will keep them to myself."

The Court, on the trial at February Term, 1848, refused to receive the amended counts, and on demurrer to the original count, dismissed the Action, which decisions are brought up to be reviewed.

J. HILLYER, for plaintiff in error.

OVERBY and UNDERWOOD, for defendant in error, contended,

1st. That the amendments were properly rejected, the cause of action being different.  1 *Tidd*, 698.  2 *Wend.* 259.  12 *Ib.* 228. At least it was a matter of discretion in which this Court will not interfere.  1 *Kelly*, 468.  3 *Ib.* 426.

2d. The words charged in the original count are not actionable *per se*.  2 *Marshall*, 502.  7 *Taunt.* 205.  1 *Har. Dig.* 929. *Prince*, 627.  *Starkie on Slander*, 293.  1 *Chit. Plead.* 267.  6 *Cow.* 76.

*By the Court.*—NISBET, J. delivering the opinion.

The principal question in this case is, whether the following words are actionable, to wit: " *I believe* Giddens burnt the Camp Ground."  The declaration contained but one count.  Upon demurrer, the Circuit Judge held that they were not.  Being excepted to, that decision is brought before us for review.  The grounds taken before this Court, in support of the Judgment below, are two :

1. It is claimed that in as much as the defendant only expressed his *belief*, that Giddens (the plaintiff) burnt the Camp Ground, there is not such a direct charge of an offence, as the law requires, to make these words actionable *per se*.

2. It is insisted, that the declaration does not show, that the tents and other houses on the Camp Ground, were *the property of another*, and is on that account defective.  Because, say the counsel, if any offence against the law is imputed to the plaintiff, it is *arson*, and the definition of arson is "the malicious and wilful burning of the house or out-house of *another*."  The declaration, say they, must show a charge descriptive of the offence, according to the definition of it in the penal code, and as it does not show that the houses charged to be burnt, were the property of some body, other than the plaintiff, it is bad.

The last objection is made to the plaintiff's pleading.  If the words, as they are set forth in the writ, are not of themselves suf-

ficient to sustain the action, we doubt whether any form of pleading would help it.

An averment, upon that assumption, that the tents and houses were the property of another, or an *inuendo*, seeking to supply the deficiency complained of, would not be admissible. The office of the *inuendo* is to explain the meaning of the words spoken, by reference to facts previously ascertained by averments or otherwise. It cannot supply defects in the words spoken—that is, it cannot make words actionable which otherwise are not actionable—1 *Starkie*, 418 *to* 532. 2 *Salk.* 513. 1 *L'd Ray.* 256. 12 *Mod.* 139. 1 *Will. Saund.* 243. We shall therefore consider this objection as going not so much to the form of the pleadings, as to the sufficiency of the words spoken, as they appear in the writ, to sustain an action.

In this view of it, the objection would run thus—the words spoken are not actionable, because they do not impute to the plaintiff the crime of arson, in this, that they do not charge him with having burned the house or out-house *of another.*

Among the rights of personal security, are those of character. Character is as necessary to the happiness and success of the citizen as any thing else. It is that which gives value to all other rights. It is sacred in proportion to the public appreciation of it. Hence in highly civilized and highly moral communities, the abhorrence of the vile arts of the slanderer is, as it ought to be, extreme. The injury of slanderous words is as great in our States, as any where else in the world, because in no other State, is character more highly appreciated—more available—or more necessary to happiness. The law of slander has become, on these accounts, vastly more rigid than it formerly was. The first suit for defamation in England occurred in the reign of Edward III.

It would be absurd to apply the law of that day, to the civilization of this. The history of this branch of the law, is but a histor of mutations—of subtle distinctions—and absurd technicalities. Many of the latter are revolting to common sense. It were indeed an unprofitable task to trace that history. I have no relish for it, and shall confine myself to the exigencies of the case before me. In England, and much more in this country, this subject has been attended with this difficulty, to wit : whilst it has been necessary to protect the fair fame and character of the citizen, it has been equally necessary, that freedom of speech and the liberty

of the press should be preserved. The latter, in a land of laws, which spring out of and derive their chief sanction from, public opinion, in a land of essential equality of right and privilege, in a land of official accountability to the moral sense of a christian public, is as sacred as the former. The great constitutional rule of the American Union, embracing both the freedom and the restraint of the press and of speech, has been laid down by eminent authority in the following words, " every citizen may freely speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that right ;* and no law can rightfully be passed to restrain or abridge the freedom of speech or of the press."— 1 *Kent's Com.* 17 *to* 24. The two great elements of this rule are *freedom* and *accountability.* Accountability to the law. To know the *law* of accountability therefore, becomes a matter of serious concern to every man. The ground of liability for words actionable *per se* is *damage* to the person charged—or to be more explicit, *the immediate tendency of the words themselves to produce damage to the person of whom they are spoken.* The inconvenience, damage or injury which results from a charge of crime, is twofold, to wit : degradation in society and exposure to criminal liability. Founded upon this idea of damage, Mr. Starkie, after a review of the English cases, deduces from them the following rule, as to words actionable of themselves. " To impute any crime or misdemeanor for which corporal punishment may be inflicted, in a temporal Court, is actionable without proof of special damage." 1 *Starkie,* 43.

There are very material variations between the law of libel and slander in this country, from what it is in England. The rule above, of Mr. Starkie, has not received the assent of the American Courts. He makes the test of slander, to be the imputation of a crime or misdemeanor, for which corporal punishment may be inflicted. The infamy of the crime and of the punishment, is excluded. And although all violations of law may be considered as disreputable, yet there are violations of law, which tend so slightly to degradation, as in a very remote degree, to attach infamy to the offender. So in *Ogden vs. Turner, Salkeld,* 696. *Holt,* C. J. remarked, " it is not a scandalous punishment—a man may be fined and imprisoned, in trespass—there must not only be imprisonment but an *infamous punishment.*" According to this rule, it would be actionable to say of another, he has committed an as-

sault and battery ; for that is a crime punished by imprisonment in the county jail. The better rule, as it seems to me, is laid down in *Brooker vs. Coffin,* by the Supreme Court of New York. *Spencer,* C. J., in that case said, "Upon the fullest consideration we are inclined to accept this as the safest rule, and one which, as we think, is warranted by the cases. In case the charge, if true, will subject the party charged to an *indictment* for a crime involving *moral turpitude* ; or subject him to an *infamous punishment,* the words will be in themselves actionable." 5 *J. R.* 188. This rule was recognised, by the same Court in subsequent cases, and by many other Courts of the United States. *Wedrigg vs. Oyer and wife,* 13 *J. R.* 124. *Martin vs. Stilwell,* 13 *Johns. R.* 275. *Van Ness vs. Hamilton,* 19 *Johns R.* 367. *Young vs. Miller,* 3 *Hill,* 22. See also 3 *Seary & Rawle,* 255. 1 *Harrison, N. J. R.* 12. 1 *Binney,* 542. 5 *Ibid* 218. 2 *Bibb, K. R.* 473.

With minuter specification, it is stated by Chancellor Kent thus, "The injury consists in falsely and maliciously charging another with the commission of some public offence, criminal in itself and indictable, and subjecting the party to an infamous punishment, or involving moral turpitude, or the breach of some public trust, or with any matter relating to his particular trade or vocation, and which, if true, would render him unworthy of employment." 2 *Kent's Com.* 15-16. The rule, in truth, as adjudged in *Brooker vs. Coffin* by the Supreme Court of New York, is sustained by several of the English cases. A leading case is that of *Onslow vs. Horne,* 3 *Wills.* 177. in which Lord C. J. De *Gray* says "the words must contain an express imputation of some crime liable to punishment—some capital offence, or other *infamous* crime or misdemeanor." Although Mr. Starkie deduces the English rule, as stated, from all the cases, yet he says that the most correct rule, is that laid down in *Onslow vs. Horne,* 1 *Starkie,* 42. See also to the same effect, *Holt vs. Scholefield,* 6 *T. R.* 694. *Salkeld,* 696.

The imputation or charge in this case, is that the plaintiff is guilty of the crime of arson. *Arson,* under our code, is the "malicious burning of the house, or out-house of another." *Prince,* 627. The *out-house* of another by the code, is a barn, stable or *any other house,* (except the dwelling house) on a farm, plantation or *elsewhere* (not in a city, town or village.) And the punishment of this offence is imprisonment in the Penitentiary, at hard labor, for

Giddens *vs*. Mirk.

any term not less than two nor more than seven years. *Prince,* 627. If these words impute the offence, it is one which is indictable and punishable corporally, and both the crime and the punishment are infamous. The charge, if true, would degrade the plaintiff in society and subject him to penal liability. The case, therefore, falls within either of the rules, as to words actionable *per se.*

I inquire now, whether the charge being made upon the *belief* of the defendant makes it innocuous, and relieves the words from their actionable qualities. The injury of slander consists, it will be remembered, in the tendency of the words spoken to degrade the person charged, and to subject him to criminal liability. We shall hereafter see, that the words are to be taken according to the understanding of them, by those who hear them. If that understanding of them imputes the offence—if that understanding degrades the plaintiff in society, or rather has the tendency to degrade him and to subject him to criminal liability, they are sufficiently distinct and direct, and are actionable. I cannot conceive that a charge that " Giddens burnt the Camp Ground," would tend any more, in the judgment of common sense, as exercised by ninety-nine sensible men in one hundred, to degrade him, or to subject him to a prosecution for arson, than the charge " *I believe* Giddens burnt the Camp Ground." What is belief? I do not now speak of one's speculative belief in Religion—morals or science. What is belief in an existing *fact ?* What is a man understood to assert, when he says I *believe* that a fact exists or that a given thing was done by another. *Belief* is the conviction of the mind, founded on evidence that a fact exists—that an act was done—that a statement is true. And when one says, I *believe* that a fact exists, or that an act was done by another, he must be understood to assert that there is present to his mind evidence sufficient to convince him, that the fact does in reality exist, or that the act was done. The evidence may be more or less—it may be of one kind or another—the evidence of the senses, hearsay, or of circumstances. It is not the business of the hearer to determine the quality or the character of the evidence. He is bound to infer the existence in the mind of the relator, of testimony enough to work conviction of the truth of his assertion. If it were not so, then we should believe nothing upon the authority of others—nothing that is not demonstrated to our minds. Faith and

confidence, the great ligaments of society, would be excluded, and men would be held either insane jesters, or arrant liars, until by testimony foreign to their statements, we are satisfied that they tell the truth.   And this I have no doubt is the ordinary understanding of the matter among men.   It is the ordinary understanding of statements which are in themselves harmless.   Much more are men held to be convinced of the truth of a charge, which they say they believe, which involves terrible punishment to the person charged, if true, and heavy responsibility upon the accuser if false.   Such charges are by ordinary men, considered as made with deliberation, and with a knowledge of all the consequences which they involve.   If in this case the defendant had said, " Giddens burnt the Camp Ground," those who heard him would have believed that he meant to say, that he was convinced that he burnt it.   Is that impression weakened, when he declares "I *believe* Giddens burnt the Camp Ground ?"   The words, *I believe*, neither add to, nor diminish that impression.   The direct charge involves the belief—it is merely supererogation to say *I believe*.   In either case, the whole weight of the accuser's conviction of the truth of the charge falls upon the accused.   The tendency of the charge in either case is to awaken suspicion of guilt—to degrade—to arouse the diligence of the officers of the law—to subject the accused to arrest and to prosecution.   It cannot be questioned, I apprehend, but that a statement on oath of the belief of one, that another is guilty of a crime, would justify a magistrate, in issuing a process for his arrest.

The point I am now considering is settled in favor of this action, upon sufficient authority.   The expression of a *suspicion* or *opinion* that another has committed a crime, is actionable.   1 *Starkie*, 63.   4 *Co.* 15.   *Poph.* 210.   *Latch*, 176.   3 *Buls.* 262. *Suspicion* is weaker than *belief*, and *opinion* no stronger.   One hearing that his father's barn was burned, said, " I cannot *imagine* who should do it, but the Lord Stornton," and these words were held actionable.   1 *Starkie*, 64.   *Mo.* 142.   1 *Vin. Ab.* 435.

To say " I *imagine* that Giddens burnt the Camp Ground," is not so clear and direct an imputation of the crime of arson, as to say " I *believe* that Giddens burnt the Camp Ground."   It imports a more certain and fixed conviction to say I *believe*, than it does to say I *imagine*.   So it was held actionable to say " I *think* or *dreamed*, that he committed a certain felony." *Smith vs. Wis-*

Giddens *vs.* Mirk.

*dome, Cro. Eliz.* 348.   6 *Bac. Ab.* 227.   So also to say, "*I am thoroughly convinced* that you are guilty;" because "I am thoroughly convinced," was held to be equal to a positive averment. *Peake vs. Oldham, Cowp.* 275.   In the case of *Miller vs. Miller,* 8 *Johns. R.* 174, the words, "my watch was stolen in Polly Miller's bar, and *I have reason to believe* that Sina Miller took it and that her mother Polly Miller concealed it," were held actionable. The Court held, that the assertion of the defendant, that he had *reason to believe* that one took and the other concealed the watch, was equivalent to the charge that one stole or took, and the other concealed, the watch.   It held distinctly, that to say "*I have reason to believe,* &c."amounts to a positive averment.   For, say the Court, "a man only alleges a thing to be so, because he has reasons for believing it so."

In *Ney vs. Otis,* 8 *Mass. R.* 122, the words were, "*I will venture any thing* he stole the book," and were held actionable.   In *Logan vs. Steele,* 1 *Bibb,* 593, expressions by the defendant, that he *had reasons to believe* that the plaintiff burnt the barn, were held to be actionable. *See also Barnman vs. Boyer,* 3 *Binney,* 515. In the case of *Davis vs. Noak,* 1 *Starkie, R.* 377, the words by the defendant were, "that he *suspected and believed, and had good reason to suspect and believe,* that the plaintiff had stolen his goods." Lord Ellenborough held them actionable, and said "the accusation could not have been more direct unless he had seen the very act."

In *Waters vs. Jones,* the Supreme Court of Alabama, review all the cases on this point in a somewhat labored and good opinion by *Collier,* J., and decide, that to say of another, "I believe that he knew of the burning of the Gin and was concerned in it," is actionable.   3 *Porter,* 442.   1 *Bibb,* 563.   We are, upon the strength of these authorities and upon the reason of the thing, fully satisfied that the expression of the defendant's belief, in this case, does not take the words out of the general rules, by which they are made actionable.

But it is said further that these words are not actionable because the offence, Arson, is not charged with precision, according to its definition in our penal code, that is to say, the defendant did not say, that the houses and tents, were *the property of another.*   The declaration avers that the defendant intended to impute to the plaintiff the offence of Arson.   But suppose the words

do not amount to a charge of that offence, but do amount to some other crime ; in that event I apprehend the action might be sustained. We think, however, that the words do impute the offence of Arson. It is incumbent on the party who complains that he has suffered from the imputation of crime, to show with certainty the injurious nature of the communication. 1 *Starkie*, 44. In order to do this it is not, however, necessary, that the words, spoken should describe the offence with that precision with which it is necessary to set forth an offence in an indictment. It is only necessary that the words should, of themselves or by reference to circumstances, be capable of the offensive meaning attributed to them. The rule once was that Courts would construe words, even after verdict for the plaintiff, in their *mildest sense.*

But the doctrine of the *benignior sensus* is now exploded, and charity is now in her right position, for she stands on the side of the accused. In the case of *The King vs. Horne,* Lord *Mansfield* said, " if Courts of Justice were bound by law to study for any one possible or supposable case, or sense, in which words used *might be innocent,* such a singularity of understanding might screen an offender from punishment, but it would not recall the words or remedy the injury. It would be strange to say, and more so to give out as the law of the land, that a man might be allowed to defame in one sense and defend himself in another. Such a doctrine would indeed be pregnant with the *nimis subtilitas* which my Lord *Coke,* so justly reprobates." 1 *Cowp.* 672. 1 *Starkie,* 47. 8 *Mod.* 24. 10 *Ib.* 196. *Cowp.* 277.

It is now settled law, that both Judges and Juries shall understand words in that sense which the author intended to convey to the minds of the hearers, as evidenced by the whole circumstances of the case. That it is the province of the Jury when such doubts arise, to decide whether the words were used maliciously, and with a view to defame, such being matter of fact, to be collected from all concomitant circumstances; and for the Court to determine whether such words, taken in the malicious sense imputed to them, can alone, or by the aid of the circumstances stated upon the record, form the legal basis of an action. 1 *Starkie,* 47. This rule embraces pretty much the whole doctrine, as to the mode of determining what constitutes slander. It submits the question of malice to the jury—also the question whether the words used, were intended to defame. That is, whether they were used with

Giddens *vs.* Mirk.

a view to impute an offence.    Or perhaps more accurately, wheth-
er the words themselves, and the attendant circumstances as they
appear on the record, tend  to degrade the  accused or to subject
him  to  criminal  liability.    It  further establishes the criterion of
Judgment for the Court, and the Jury as to the slanderous char-
acter of the words—and that is this, *the words are to be understood
in the sense which the author intended to convey to the minds of the
hearers.*    Much of the technical nicety of the words, which in too
many instances in former times worked immunity to the slander-
er,  is  now  very  properly disclaimed, and the broad and liberal
and just rule established, by which, if such words are maliciously
uttered,  as  in  the  judgment of the hearers tend to impute crime,
to degrade and to subject to  an  infamous  punishment, they are,
whether accurately  descriptive of  an offence or not, slanderous
and actionable.    Such a rule comes fully up to the  requirements
of  common sense and  common  justice.    It  is  equal to the full
protection of character.    Under it, it is impossible for a man to
slander in one sense, and defend in another.    To cover vitupera-
tion  under  irony, untechnical hints, covert insinuations, or any
form of words, which skilfully avoiding a legal definition of crime,
yet communicates the poison of slander.    The Jury are to deter-
mine whether the words, in the sense in which the author intend-
ed himself to be understood by his hearers, impute an offence.—
In support of the doctrine now affirmed, I shall refer to only a
few of the many authorities to be found in the books.  In *Creely vs.
Hoskins, Cro. Car.* 509.  Croke says, " Jones, Berkly and my-
self held clearly, that the action will lay, and that such foreign in-
tendment as *Maynard* pretended, shall not be conceived, and it
shall be taken that he spake these words maliciously, accusing
him of perjury, and for a false oath taken judicially, upon judicial
proceedings in a Court of record, and *shall be taken according to
the common speech, and usual intendment.*"

In *Somers vs. House, Holt* 39, Holt said " we will take the words
in a common sense, *according to the vulgar intendment of the by-
standers.*"

In *Harrison vs. Thornborough,* 10 *Mod.* 196,  the Court deter-
mined that the rule which then prevailed was this, "words are to
be taken in that sense that is most obvious and natural, and in
which those to whom they are spoken will be sure to understand
them."

Lord *Mansfield* observed in *The King vs. Horne*, 1 *Cowp.* 672, " It is the duty of the Jury to construe plain words and clear allusions to matters of universal notoriety according to their obvious meaning, and as every body else who reads must understand them. But the defendant may give evidence to show that they were used on the occasion in question in a different or qualified sense. *If no such evidence is given, the natural interpretation of the words, and the obvious meaning to every man's understanding, must prevail.*"

So in *Peake vs. Oldham*, *Cowp.* 277, his Lordship said, " where from the general import of the words, they appear to have been used with a view to defame the party, the Court ought not to be industrious to put a construction upon them *different from what they bear in the common acceptation and meaning of them.*"

In the *King vs. Watson*, *Buller, J.* observed, " Upon occasions of this sort 1 have never adopted any other rule, than that frequently stated by Lord Marsfield to Juries, desiring them to read the paper stated to be a Libel *as men of common understandings,* and say whether in their minds, it conveys the sense imputed." 2 *T. R.* 206.

In *Roberts vs. Cambden*, 9 *East.* 96, Lord *Ellenborough* said, "The rule which once prevailed that the words are to be understood *in mitiore sensu* has been long ago superseded. And words are now construed by Courts, as they always ought to have been, in the plain and popular sense in which the rest of the world naturally understand them." *See also, Demarest vs. Harring*, 6 *Cowen,* 37, *Walton vs. Singleton*, 7 *Serg. & Rawle* 451. *Van Vechten vs. Hopkins,* 5 *John. R.* 221. *Deseter vs. Taber*, 12 *Ibid*, 240. *McKinley vs. Rob*, 20 *Ibid*, 356. *Gorham vs. Ives*, 2 *Wend.* 534.— *Gibson vs. Williams*, 4 *Wend.* 320. 13 *Mass.* 248, 254. 2 *Pick.* 240, 12 *Mass.* 498. 6 *Cow.* 76. 11 *Wend.* 38.

The Jury being the Judges of the fact whether words according to the rule laid down, impute an offence (in this case Arson,) to the plaintiff, we are very clear that for that reason, the demurrer ought not to have been sustained. There is beyond question enough in the declaration to have sent the case to the Jury. But if the question were before us on a motion to arrest, according to that rule of judgment which the authorities prescribe to us, we should have no difficulty in saying, as this case stands on the record, that the action ought to have been sustained. If it were

Giddens *vs.* Mirk.

matter of doubt whether the words used in this case, were intended to impute the offence of Arson, the solution of that doubt does not belong to the Court, but to the Jury—that is a fact for them to find. Now if the Jury had passed upon this case, and found in favor of the plaintiff, they would by their verdict have established, that the words were uttered in the malicious sense imputed to them by the plaintiff, and with a view to impute to him the offence of Arson. Suppose that after verdict, a motion were made to arrest the judgment; in considering that motion the Court would be compelled to take the finding as true. That is, it would have to consider of the words under a concession that they were spoken maliciously, and with a view to impute to the plaintiff the offence. The rule is the same, in case of demurrer. We are compelled to take the averments in the declaration as true. That is, we are compelled to view the words as spoken maliciously, and with a view to impute an offence. 1 *Stark.* 47. The question *then* is, whether these words, taken in the malicious sense imputed to them singly, or by the aid of the circumstances stated on the record, form the legal basis of an action. 1 *Starkie,* 47. The declaration avers that the defendant said of the plaintiff, *I believe Giddens burnt the Camp Ground.* The *colloquium* and *inuendo* explain the words *Camp Ground* to mean the houses and tents at the *Dry Pond Camp Ground.* The Dry Pond Camp Ground was an incorporated institution, and that fact is judicially known to us, and was judicially known to the Court below. That too we are to presume, is a fact of public notoriety; a fact known to the community. Being incorporated, it was authorised to hold property in the tents and houses located on the ground. That, we are fairly to infer, was the common understanding of the neighborhood. It is fair to presume, that these houses and tents were understood in the neighborhood not to belong to Giddens, the plaintiff. Now, when the defendant in conversation concerning the houses and tents of the Camp Ground, and calling the plaintiff by name, asserts his belief that he (the plaintiff) *burnt* the Camp Ground, what is the sense, in the judgment of the bystanders, construing these words in their ordinary popular signification, in which he (the defendant) intended to be understood? The word *burnt,* imports of itself Arson. A charge of *burning,* amongst common men, conveys the idea of crime ; a very heinous crime, reproachful and degrading and highly penal. Can it be inferred, when under such circumstances Giddens is charged with burning the

Camp Ground, that the defendant intended to be understood, as charging him with burning *his own property.* For to escape from the inference that the words impute the offence of Arson, it is necessary to establish the inference, that defendant intended to be understood as charging the plaintiff with burning a Camp Ground, which was not the *property of another, but his own.* Such an inference is not natural—it is exceedingly difficult—indeed I might add impossible. The hearers could not so understand the words. The contrary inference is irresistible. They must have understood the defendant to intend to say, that Giddens burnt a Camp Ground which was *not his own ;* and if so, the offence of Arson was imputed to him. Judging that such must be the meaning of these words alone, or together with the attendant circumstances stated on the record, taken in their natural and usual signification, in the view of those who heard them, we say, that they constitute, in the language of the rule, *the legal basis of an action.*

[2.] And that the Court below erred in sustaining the demurrer. The demurrer to the declaration being sustained, the plaintiff entered an appeal, and on the appeal proposed to amend by adding other counts. The Circuit Judge very properly refused to allow the amendments. For as the case stood before him, there was nothing in the writ to amend by.* The amendments were a new and substantive cause of action. *See Latine vs. Clements,* 3 *Kelly,* 426. But as in the Judgment of this Court the demurrer was improperly allowed, the declaration now stands unimpeached, and the amendments, being as we believe, but variant statements of the original cause of action, may be added.

Let the Judgment be reversed.

---

*Note.—The same rule in Equity. See Supra *Dudley vs. Mallery.*—Rep.